## Case No. 1,366.

### The BETSY and RHODA.

[2 Ware, (Dav. 112,) 117;[1] 3 N. Y. Leg. Obs. 215.]

District Court, D. Maine. Nov. 9, 1840.

SEAMEN — WAGES — PAYMENT — ACCEPTANCE OF PROMISSORY NOTE—COMMON-LAW RULE — LAW OF MAINE—ADMIRALTY.

1. By the common law, a simple contract debt is not extinguished by the creditor's taking a new security for it, unless the security be of a higher nature, as an instrument under seal, or unless it be agreed to be received in satisfaction of the debt.

2. But by the law of Maine, if a negotiable security be given for a preëxisting simple contract debt, the legal presumption is, that it is received in payment, and that it is an extinguishment of the original cause of action; but this presumption is liable to be controlled by proof to the contrary.

3. The presumption of the local law will not be enforced by the admiralty, against a seaman who receives of the owners their negotiable note for his wages.

4. Such a note will not be held to be an extinguishment of the claim for wages, nor of the lien of the seaman against the ship, unless it is distinctly stated to him at the time that such will be the effect, and the note is accompanied by some additional security or advantage to the seaman as a compensation for his renouncing his lien on the vessel.

[Cited in The Eclipse, Case No. 4,268; The Helen M. Pierce, Id. 6,332.]

[5. Cited in McCarty v. The City of New Bedford, 4 Fed. 828, to the point that seamen, in matters respecting their wages, have a right to sue and be sued in admiralty.]

In admiralty. This was a libel in rem, for wages. The libellant shipped, Oct. 9, 1839, for a coasting voyage, along the coast of the United States, as mate, for twelve dollars a month. In the prosecution of the voyage, the vessel went to Savannah, and was there employed as a lighter on the river for a considerable time, when she returned to Portland. The libellant claimed a balance of

[1] [Reported by Hon. Ashur Ware, District Judge.]

$46.10 due. After his discharge he called on the owners for his pay, but they, not being ready to pay, offered him their promissory note for the amount, payable in twenty days. This offer was made in the office of the counsel of the owners. He objected to receiving it and stated as a reason, his apprehension that it might put at hazard his right to proceed against the vessel. It was not stated to him that it would or would not be a waiver of his lien on the ship. But he was persuaded to take the note upon the representation that he would get his pay sooner on the note than he would by a libel against the ship. When he called for his pay at the maturity of the note, the owners gave him in exchange for it an order on their counsel. That not being accepted, he returned it, and took back the note, and filed a libel against the ship. The note was brought into court and offered to be surrendered. The defense was, that by consenting to take the note the lien was discharged. [Decree for libellant.]

Mr. Haines, for libellant.
Mr. Bradford, for respondents.

WARE, District Judge. It is not denied that the services, for which wages are claimed, have been performed, and that the balance demanded by the libellant remains due and unpaid. The only question is, whether by consenting to take the promissory note of the owners for the sum due, he has or has not lost his right of proceeding against the vessel; notwithstanding the note is brought into court and offered to be surrendered to the makers.

By the maritime law, the ship is hypothecated to the seamen for their wages, and so long as the debt remains due in the quality of wages, the lien against the vessel continues in force. If the lien is lost, it must be because the acceptance of the note operated as payment or as a legal extinguishment of the claim for wages for which it was given. By the common law, a debt due on simple contract is not discharged by the creditor's accepting another obligation of the same nature for the same consideration. Johnson v. Johnson, 11 Mass. 359. The new title is not considered as an extinguishment of the old debt, but is treated as a merely collateral and additional security.

The same principle prevailed in the civil law. A creditor, by taking a new obligation for a debt, did not extinguish the old title. The original obligation remained in force, and the second was held to be merely an accessory, which of course became extinct when the principal was satisfied. The new title was never held to supersede the original cause of action, unless such was clearly proved to have been the intention of the parties. When this was the case, there was constituted what was technically called a novation. The old debt was transferred to the

new obligation, and the original cause of action was extinguished, and all the accessory and collateral securities attached to it were abandoned. 2 Warkoenig, Jus Romanum Privatum, § 525. By the constitution of Justinian, a novation could never be inferred from presumptive evidence; it could stand only on the express agreement of the parties. Code 3, 42, 8; Inst. 3, 29, 3. The rigor of this constitution has not been followed, generally, by those nations which have adopted the Roman law as the basis of their jurisprudence. A novation may be inferred from circumstances, but they must be clear, urgent, and conclusive, such as leave no doubt of the intention of the parties. Gaill, Practicarum Observationum, lib. 2, Ob. 30, § 3; Voet, Ad. Pand. 46, 2; 3 Vinnius, Comm. in Instit. lib. 3, 30, 3, § 7; 7 Toullier, Droit Civil. No. 276.

This rule of jurisprudence, which equally prevails in the common law and civil law, is founded on this plain and reasonable principle, that no one ought, on slight circumstances, to be presumed to renounce any of his rights. When a new security is taken for an old debt, the natural and legal presumption is, that it is taken as collateral, unless it is expressly agreed, or is clearly to be inferred from the circumstances, to have been the intention of the parties to cancel and annul the original cause of action, and substitute the new title in its place.

If the present case is to be decided upon these principles, it is clear that the defense cannot prevail. It is manifest from the evidence, that the libellant did not actually consent to renounce his right of proceeding against the vessel, because he objected to taking the note upon the very ground that it might endanger this right.

It is true that, by the local law of this state, the acceptance of a negotiable security for a pre-existing debt, by simple contract is generally held to be payment, and an extinguishment of the original cause of action. Thacher v. Dinsmore, 5 Mass. 299; Chapman v. Durant, 10 Mass. 47; Whitcomb v. Williams, 4 Pick. 228; Wood v. Bodwell, 12 Pick. 268, 270; Varner v. Nobleborough, 2 Greenl. 121; Descadillas v. Harris, 8 Greenl. 298. The reason assigned for this departure from the principles of the common law is, that the debtor might otherwise be put to inconvenience, and possibly be compelled to pay the debt twice, as he could not successfully defend himself against an action on the note in the hands of an innocent indorsee, by showing that the debt, for which it was given, had been otherwise satisfied. The law, therefore, raises a presumption against the creditor, who has taken such security, that he has renounced his right of action on the original contract. This, however, is only a presumption, which may be overcome by proof to the contrary; but the burden of proving this is thrown on the creditor. Ma-

neely v. McGee, 6 Mass. 143; Johnson v. Johnson, 11 Mass. 359. This is not only an innovation on the common law; it is also a departure from the general law merchant. That puts upon the debtor the burden of proving that the note was intended by the parties as a satisfaction of the debt. Roades v. Barnes, 1 Burrows, 9; Sheehy v. Mandeville, 6 Cranch, [10 U. S.] 253; Clark v. Young, 1 Cranch, [5 U. S.] 181; Drake v. Mitchell, 3 East, 251; Peter v. Beverly, 10 Pet. [35 U. S.] 567, 568; Wallace v. Agry, [Case No. 17.096.] Like the common and civil law, it adheres to the natural presumption, that when two securities are given for the same debt, both titles are intended to be valid and binding until the contrary is proved, though but one satisfaction can be demanded.

Admitting, then, that this case is to be governed by the local law, it is still, on the most rigorous interpretation of the rule, an open question upon the evidence, whether the note was received in satisfaction of the wages, or not. The testimony on this point is not of a very conclusive character. The libellant consented to take the note, on the assurance that he would obtain his money on the note sooner than he could get it by a libel against the vessel. And he took it with an uncertainty in his own mind, whether he would thereby lose his remedy against the vessel. That uncertainty was not removed by the owners, although it is manifest that they acted under the impression that such would be the effect, and the business was transacted in the presence and under the advice of their counsel. It may be conceded, that if this had been a transaction between merchant and merchant, the presumption of the local law ought, upon this evidence, to prevail. They would be dealing on equal terms, and neither party would be under any obligation to communicate what both are presumed to know; for, ordinarily, every man is presumed to know the legal consequences of his own acts. But this was between the merchant owners and a seaman. In the admiralty, seamen are always treated as a favored class of suitors, and entitled to a large and liberal protection as being, in a qualified sense, the wards of the court. From their open and unsuspicious character, their inexperience in business, as well as their usual state of destitution and notorious improvidence, they are extremely liable to be overreached, by the superior knowledge and foresight of those with whom they deal, and drawn into unequal bargains. And especially does their poverty, with their habitual recklessness of the future, place them in a state of dependence, which subjects them very much to the power and influence of their employers. They in all respects stand on unequal ground, with unequal advantages, in treating with the merchant owners, a class of men, who, by their education, habits, and

course of life, are as remarkable for their shrewdness and quick perception of their interest, and the systematic steadiness with which it is pursued, as seamen are for the reverse. A court of admiralty will, therefore, interpose to protect them from the consequences of their own heedlessness and ignorance, upon the same principles that courts of equity protect, against their improvident bargains, young heirs dealing with their expectancies, or wards and cestui que trusts dealing with their guardians and trustees. It habitually looks with jealousy upon the contracts and dealings of owners with them, when there is any departure from the ordinary terms of the contract, or the usual course of dealing; and if it appears that from their improvidence or necessities, they have been induced to waive any of their rights, without an adequate compensation, the court will set aside the most express stipulations as inequitable. The Juliana, 2 Dod. 504. Harden v. Gorden, [Case No. 6,047;] The Minerva, 1 Hagg. Adm. 355; Brown v. Lull, [Case No. 2,018;] 3 Kent, Comm. 193.

Upon these principles, how stands the defense of this cause? The libellant was persuaded to accept for his wages a promissory note, on the representation that he would thereby obtain the money without the expense and trouble of a suit, and sooner than he could get it by a libel against the vessel; and for these considerations the owners now contend that he renounced his lien on the ship, to which a seaman always looks as his best security.

Now, in the first place, it is to be observed that the first part of this representation turns out, as the present suit shows, to be a failure by a breach of contract, on the part of the owners themselves. The second part, to wit, that he would obtain his wages sooner through the note than he could get them by a libel against the vessel, was untrue in point of fact, even on the supposition that the note had been paid at maturity. The note could not be demanded until after the expiration of twenty days. But a libel for wages, when the parties are all present and there is no defense, is never permitted to remain in this court for half that time. To a seaman, the delay is, in many cases, equivalent to the denial of justice. His daily bread is earned by his daily labor, and that is of course upon the water. He is unfitted by his tastes and his habits for the common occupation of a laborer on land. It would be difficult for him to find employment if he sought it, and not easy for him to perform the service, if the employment was found. He usually has not the means to pay his expenses ashore for any length of time, and if he had, it would be better for him to abandon a moderate claim, than to await the distant result of a suit, in its slow progress through the forms of the ordinary courts of justice. In all maritime countries, therefore, seamen are privileged to go into their own peculiar courts, whose course and forms of proceedings, are adapted to the direct and guileless character of the suitors, and the simplicity of their causes; where the proceedings are prompt, and justice is administered without delay. "Velo levato—sine strepitu forensi." Kurik. Quaest. Illust. Quaest. 37, Locc. De Jure Mar. lib. 3, c. 10. In the admiralty, causes for substraction of wages are always summary, without the prolix formalities and delays of plenary causes. The considerations, therefore, for which the libellant was induced to waive his lien on the vessel, if such be the legal effect of the act, have either failed in point of fact, or were founded in error and mistake.

But further; he never did, in point of fact, consent to waive his remedy against the vessel. A doubt, it is true, arose in his mind, whether such might not be the legal consequence of his accepting the note, but unless this was the necessary result in law, he did not make it so by his consent. If, then, it is to be adjudged that the lien is lost, it must be simply by force of the presumption of the local law, against the rule of the common law, and the general law merchant; and equally in opposition to the principles of the civil law and the natural presumptions arising out of the contract itself. For when a creditor takes a new security, the natural presumption is, that it is taken as subsidiary to the original obligation, unless it be a security of a higher nature. But in the present case, it was of an inferior nature, or rather, it was a renunciation of the better part of his actual security, without any compensatory advantage. For the owners were equally liable on the contract for wages, as upon the note, and for these also he had a remedy against the master and the vessel, in addition to the personal liability of the owners.

It is not necessary for me to consider how far a court of common law would feel itself bound to enforce against a seaman in this case the rule of the local law. A court of admiralty, it is certain, will, in some cases, give a remedy where a court of common law would not. By its constitution, it is required to decide ex aequo et bono, and its practice shows that it is not, in the administration of justice, tied down to the dry, and sometimes harsh rules of the common law. Within the limits of its jurisdiction, it acts upon the liberal and enlarged principles of a court of equity; and especially it does so in dealing with the contracts between seamen and shipowners. Brown v. Lull, [supra;] The Minerva, 1 Hagg. Adm. 347; The Fortitudo, 2 Dod. 58, 72; The Bellona, [Case No. 4,406.] It goes as far in extending its protection to the weaker party in these cases, as a court of equity does in any case, unless it be where a party is strictly a ward of the court, and it acts in the character of a guardian. It applies the same protective principles that a court of general equity jurisdiction does

where the parties stand to each other in fiduciary relations, as that of attorney and client, beneficiary and trustee, or principal and agent, and will not allow an owner to derive any benefit from a surprise he has practiced upon the inexperience or ignorance of a seaman, or an advantage he has taken of his necessities.

In this view of the habits and the course of a court of admiralty, I do not feel myself authorized to say that the libellant, in taking the note, waived his privilege against the ship. He acted under a species of constraint. He was indigent, and needed prompt payment. He was entitled to it without delay, and he consented to receive the note upon the assurance that it was his most expeditious mode of obtaining it. The most that can be said is, that it may have suspended his rights of suing out process until the note arrived at maturity, or until he surrendered it to the makers. To have given to the act the effect of a waiver of his privilege, and an extinction of the lien, it should in the first place have been distinctly stated to him that such would be the result; and as at present advised, my own opinion is, that the note should also have been accompanied with some other security, in addition to the personal liability of the owners, as an equivalent and a compensation for the discharge of the lien.

This, it appears to me, is the judgment which the court is required to pronounce on this transaction; and my mind is fortified in this conclusion, by the judgment pronounced by the circuit court, in the case of Brown v. Lull, before referred to. The court there stated, with great clearness and force, the reasons for watching with jealousy any innovation upon the usual form of the mariners' contract, and the conclusion from the whole is, that "whenever any stipulation is found in the shipping articles, which derogates from the rights and privileges of seamen, courts of admiralty hold it void, as founded on imposition or an undue advantage taken of their necessities and ignorance and improvidence, unless two things concur;—first, that the nature and operation of the clause is fully explained to them; and secondly, that an additional compensation is allowed, entirely adequate to the new restriction and rules imposed upon them thereby."

The same reasons of natural justice and public policy, upon which these principles are founded, apply, with equal force, to any adjustment or settlement of the wages after they are earned, by which they are not actually paid. The wages, while they remain due in that quality, are a privileged debt; and a seaman ought not to be presumed to waive any privilege attached to his demand, unless the legal effect of the settlement is fully explained to him at the time, and some advantage or security is allowed in compensation for that which he renounces. My opinion therefore is, that the lien is not lost.